Opinion for the court filed by Circuit Judge TARANTO. Opinion concurring in the judgment filed by Circuit Judge O’MALLEY.
TARANTO, Circuit Judge. ■
These appeals involve two actions brought in the District of Delaware against generic drug manufacturer Mylan Pharmaceuticals Inc. One, assigned to Chief Judge Stark, was brought by brand-name drug manufacturers Acorda Therapeutics Inc. and Alkermes Pharma Ireland Ltd.; the- other, assigned to Judge Sleet, was brought by brand-name drug manufacturer AstraZeneca AB. The plaintiffs brought the actions under 35 U.S.C. § 271(e)(2), alleging that their patents cover drugs that Mylan :has sought permission from the Food and Drug Administration to manufacture and market. Mylan moved to dismiss on the ground that Delaware could not (and so the federal court may not) exercise personal jurisdiction — either general or specific personal jurisdiction — over Mylan in these cases. Chief Judge Stark and Judge Sleet denied the motions. Although they reached different conclusions about whether Delaware could exercise general personal jurisdiction over Mylan based on consent given in registering to do business in the State, they both concluded that Delaware could exercise specific personal jurisdiction, based on Mylan’s suit-related contacts with Delaware. On interlocutory appeal, we affirm, holding that Mylan is subject to specific personal jurisdiction in these cases. We do not address the issue of general personal jurisdiction.
' ■ BACKGROUND
Under the authority of the FDA’s approval of its New Drug Application (NDA), 21 U.S.C'. § 355(a), (c), Acorda markets Ampyra® to help individuals with multiple sclerosis walk. In seeking approval for Ampjra®, Acorda identified five patents for listing in the FDA’s Approved Drug Products with Therapeutic Equivalence Evaluations publicátion — the “Orange Book.” See 21 U.S.C. § 355(b)(1); 21 C.F.R. §§ 314.3, 314.53. Acorda owns four of the patents and is the exclusive licensee of the fifth, owned by Alkermes. In' January 2014, Mylan filed an Abbreviated New Drug Application' (ANDA) with the FDA under 21 U.S.C. § 355(j), seeking approval to market generic versions of Ampyra®. Under paragraph IV of § 355(j)(2)(A)(vii), Mylan certified that ACorda’s Orange Book patents for Ampyra® are invalid or would not be infringed by Mylan’s marketing of its proposed drug. Acorda and Alkermes then sued Mylan in the District of Delaware for patent infringement, invoking the declaration of 35 U.S.C. § 271(e)(2)(A) that the submission of a paragraph IV certification constitutes an act of infringement.[1]
AstraZeneca markets FDA-approved Onglyza® and KombiglyzefM to help individuals with type II diabetes. AstraZene- *758 ca owns three patents listed in the Orange Book for those drugs. Mylan filed two ANDAs seeking approval to market generic versions of the two drugs and certified that AstraZeneca’s three patents are invalid or would not be infringed by Mylan’s marketing of its proposed drugs. AstraZ-eneca sued Mylan for infringement under 35 U.S.C. § 271(e)(2)(A) in the District of Delaware.
Mylan filed motions to dismiss under Federal Rule of Civil Procedure 12(b)(2) on the ground that the State of Delaware could not — and therefore,.derivatively, the federal district court in Delaware may not — -exercise personal jurisdiction over Mylan in these matters under the Due Process Clause of the Fourteenth Amendment. The parties do not dispute .that the standards of the Due Process Clause control whether there is personal jurisdiction in these matters. Nor do they dispute that the Due Process Clause standards permit a State to exercise either specific personal jurisdiction over a defendant in a case (based on the connection of the State to the subject matter of the particular case) or general personal jurisdiction over the defendant (based on certain facts even where the case involves subject matter not itself sufficiently connected to the State). The parties have debated both .specific and general personal jurisdiction in this case. The debate over the latter issue focuses on Mylan’s registration to do, business in Delaware as giving consent to the exercise of general personal jurisdiction.
■ The motions were decided on facts that are not in material dispute. Mylan is incorporated in West Virginia and has its principal place of business there. Mylan submitted its ANDAs to the FDÁ in Maryland, . and it did much if not all of its preparation of its ANDA filings in West Virginia. Regarding the notices of its ANDA filings required by 21 U.S.C. § 355(j)(2)(B)(iii), Mylan sent notices to Acorda in New York and Alkermes in Ireland (for the Acorda matter), and it sent notices to AstraZeneca’s subsidiary in Delaware and AstraZeneca in Sweden (for the AstraZeneca matter). Mylan has registered to do business and appointed an agent to accept service in Delaware. And, of particular importance, Mylan intends to direct sales of its drugs into Delaware, among other places, once it has the requested FDA approval to market them. The plaintiffs, for their part, also have connections with Delaware: Acorda is incorporated in Delaware, AstraZeneca’s U.S. subsidiary has its, principal place of business in Delaware, and both Acorda and AstraZeneca have sued other generic manufacturers for infringement of the same patents in Delaware.
Chief Judge Stark (in the Acorda case) and Judge Sleet (in- the AstraZeneca case) denied the motions to dismiss. Both judges concluded that Delaware had sufficient contacts related to the subject of these cases that it could exercise specific personal jurisdiction over Mylan. See Acorda Therapeutics, Inc. v. Mylan Pharm., Inc., 78. F.Supp.3d 572, 593-95 (D.Del.2015); AstraZeneca AB v. Mylan Pharm., Inc., 72 F.Supp.3d 549, 558-60 (D.Del.2014). The two judges disagreed about whether Delaware could exercise general personal jurisdiction (independent of suit-related contacts) on the ground that Mylan consented to such jurisdiction in registering to do business: they took different views of the status of Supreme Court decisions supporting such jurisdiction, e.g., Pa. Fire Ins. Co. v. Gold Issue Mining & Milling Co., 243 U.S. 93, 37 S.Ct. 344, 61 L.Ed. 610 (1917), in light of later decisions such as Daimler AG v. Bauman, — U.S. -, 134 S.Ct. 746, 187 L.Ed.2d 624 (2014). See Acorda, 78 F.Supp.3d at 587-90; AstraZeneca, 72 F.Supp.3d at 556-57. But the latter dis *759 agreement did not alter 'the finding of personal jurisdiction in these cases.
In each case the district court certified its decision for interlocutory review, and we granted permission to appeal. We have jurisdiction under 28 U.S.C. § 1292(b) and (c)(1).
Discussion
Under Fed.R.Civ.P. 4(k)(l)(A), the district court has personal jurisdiction over Mylan in these cases if Mylan would be “subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located,” here Delaware. And there is no dispute that Mylan would be subject to Delaware courts’ jurisdiction under Delaware’s long-arm statute, Del. Code Ann. tit. 10, § 3104, as long as Delaware’s exercise of personal jurisdiction over Mylan would be consistent with the Fourteenth Amendment's Due Process Clause. The jurisdictional dispute therefore turns on the constitutional question, and Mylan makes no argument against jurisdiction other than one based on due-process standards. We decide the question de novo, applying our own (not regional-circuit) law. Marial Ltd. v. Cipla Ltd., 681 F.3d 1283, 1292 (Fed.Cir.2012); Akro Corp. v. Luker, 45 F.3d 1541, 1543 (Fed.Cir.1995).
A court may exercise specific personal jurisdiction without violating the Due Process Clause when thé defendant “ha[s] certain minimum contacts with [the forum] such that the maintenance of the suit does not offend ‘traditional notions of fair play and substantial justice.’” Int’l Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). The minimum-contacts requirement focuses on whether “the defendant’s suit-related conduct ... create[s] a substantial connection with the forum State.” Walden v. Fiore, — U.S. -, 134 S.Ct. 1115, 1121, 188 L.Ed.2d 12 (2014). What conduct is suit-related depends -.on “the relationship among the defendant, the forum,- and the litigation,” Keeton v. Hustler Magazine, Inc., 465 U.S, 770, 775, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984), including specifically the nature of the claim asserted. See Calder v. Jones, 465 U.S. 783, 789-90, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984); Walden, 134 S.Ct. at 1124 (“The strength of [the defendant’s] connection [to California in Colder, ] was largely a function of the nature of the libel tort.”). In a formulation worded to address suits for retrospective relief based on past acts, the Supreme Court has said that the minimum-contacts requirement is met when the defendant “purposefully directed” activities at the forum, “and the litigation results from alleged injuries that ‘arise out of or relate to’ those activities.” Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472-73, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (citations omitted); see Grober v. Mako Prods., Inc., 686 F.3d 1335, 1346 (Fed.Cir.2012).
Here, Mylan has taken the costly, significant step of applying to the FDA for approval to engage in future activities— including the marketing’ Of its generic drugs — that will be purposefully directed at Delaware (and, it is undisputed, elséwhere). If Mylan had already begun its deliberate marketing of these drugs in Delaware, there is no doubt that it could be sued for infringement in Delaware. Its Delaware sales would be acts committed in the State that are, wrongful — if the plaintiffs here are right about infringement and validity — and would -concretely injure Acorda and AstraZeneca in the State by displacing some of their Delaware sales and likely lowering the price they could charge there. See World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); Beverly Hills Fan Co. v. Royal Sovereign *760 Corp., 21 F.3d 1558, 1565-66 (Fed.Cir.1994). In our view, the minimum-contacts standard is satisfied by the particular actions Mylan has already taken — its ANDA filings — for the purpose of engaging in that injury-causing and allegedly wrongful marketing conduct in Delaware. .
Mylan’s ANDA conduct is “suit-related” and has a “substantial connection” with Delaware, Walden, 134 S.Ct. at 1121, because the ANDA filings are tightly tied, in purpose and planned effect, to the deliberate making of sales in Delaware (at least) and the suit is about whether that in-Staté activity will infringe valid patents.’ Thus, Mylan’s ANDA filings constitute formal acts that reliably indicate plans to engage in marketing of the proposed generic drugs. Delaware is undisputedly a State where Mylan will engage in that marketing if the ANDAs are approved. And the marketing in Delaware that Mylan plans is suit-related: the suits over patent validity and coverage will directly affect when the ANDA can be approved to allow Mylan’s Delaware marketing and when such marketing can lawfully take place. See 21 U.S.C. § 355(j)(5)(B).
The Hatch-Waxman Act recognizes the close connection between an ANDA filing and the real-world acts that approval of the ANDA will allow and that will harm patent-owning brand-name manufacturers. In 35 U.S.C. § 271(e)(2), Congress declared the ANDA filing to be what has been called an “artificial act of infringement,” allowing the brand-name manufacturer to sue the ANDA filer to litigate patent validity and coverage. Eli Lilly & Co. v. Medtronic, Inc., 496 U.S. 661, 678, 110 S.Ct. 2683, 110 L.Ed.2d 605 (1990). In so doing, Congress stressed the ANDA filer’s “purpose ... to obtain approval under such Act to engage in the commercial manufacture, use, or sale of a drug ... claimed in a patent or the use of which is claimed in a patent before the expiration of such patent,” 35 U.S.C. § 271(e)(2)(A)— concrete, non-artificial acts of infringement. The relief available in such a suit, moreover, is focused on preventing or remedying the distinctly non-artificial infringing activities that threaten commercial harm: an order to delay the ANDA approval that is a precondition to marketing; an injunction to prevent commercial manufacture, sale, importation, etc.; and monetary relief for such commercial activities in the past. Id. § 271(e)(4).
Likewise, an ANDA filer’s paragraph IV certification regarding patents addresses the real-world actions for which approval is sought — specifically, whether those actions would infringe. 21 U.S.C. § 355(j)(2)(A)(vii)(IV) (certification states that patent will not be infringed “by the manufacture, use, or sale of the new drug for which the application is submitted”); 21 C.F.R. § 314.94(a)(12)(i)(A)(4) (same). This court has long recognized that the infringement inquiry called for by § 271(e)(2) is “whether, if a particular drug were put on the market, it would infringe the relevant patent” in the usual, non-artificial sense. Bristol-Myers Squibb Co. v. Royce Labs., Inc., 69 F.3d 1130, 1135 (Fed.Cir.1995); see Sunovion Pharm., Inc. v. Teva Pharm. USA, Inc., 731 F.3d 1271, 1278-79 (Fed.Cir.2013) (question is whether the conduct for which filer seeks approval would infringe); see also Eli Lilly & Co., 496 U.S. at 678, 110 S.Ct. 2683 (§ 271(e)(2)’s “act of infringement ... consists of submitting an ANDA .,. containing ... [a] certification that is in error as to whether commercial manufacture, use, or sale of the new drug (none of which, of course, has actually occurred) violates the relevant patent.”).
Notably, Congress did not authorize a patent-owning brand-name manufacturer to bring a suit over patent validity or *761 coverage just because someone, no matter who, has called the manufacturer’s patent into question by declaring in some forum— to the FDA, to investors, to the public— that the patent is invalid or of limited scope. Congress added § 271(e)(2) as a special means of litigating patent scope and validity only when such a declaration has been made by an ANDA filer — which has, by its filing, confirmed its plan to commit real-world acts that would make it liable for infringement if it commits them without the patentees’ permission and it is wrong in its challenges to patent scope'- or validity. Congress also added a provision that confers on the ANDA filer alone a special right to seek a declaratory judgment regarding patent scope and validity if the NDA holder or patent owner does not file suit first. 35 U.S.C. § 271(e)(5). Those statutory provisions treat' the ANDA filer as distinctive, and what distinguishes it is that it has, by its filing, reliably confirmed a plan to engage in real-world marketing. . ■
All of the parties acknowledged as much at oral argument. Acorda Oral Arg. at 48:32-48:48, 49:18-49:27 (Mylan), 22:59-23:47 (Acorda); AstraZeneca Oral Arg. at 21:57-22:32 (AstraZeneca). And the economic realities of preparing an ANDA confirm that filing realistically establishes a plan to market. The current fee for filing the ANDA itself is $76,030. Generic Drug User Fee — Abbreviated New Drug Application, Prior Approval Supplement, Drug Master Filé, Final Dosage Form Facility, and Active Pharmaceutical Ingredient Facility Fee Rates for Fiscal Year 2016, 80 Fed.Reg. 46,015-01, 46,016 (Aug. 3, 2015). The applicant must show bioequivalence of its proposed drug to the drug listed in the NDA, 21 U.S.C. § 355(j)(2)(A)(iv), and that showing, along with other requirements for approval of an ANDA* commonly requires costly research, see, e.g., Fiona M. Scott Morton, Entry Decisions in the Generic Pharmaceutical Industry, 30 RAND J. Econ. 421, 423 (1999) (“Interviews with FDA officials and several generic pharmaceutical managers generated estimated costs of filing an ANDA- of $250,000 to $20 million.”); Jeremy A. Greene,- Generic: The Unbranding of Modern Medicine 124 (2014) (estimating the cost for measuring bioequivalence of Valium tablets, which requires nearly two thousand blood assays on human subjects over sixteen days, at $75,000-$125,000). The applicant must also identify' “the facilities and controls used -for[ ] the manufacture, processing, and packing of [its proposed] drug,” 21 U.&C. § 355(b)(1)(D); 21 C.F.R. § 314.50(d)(l)(ii)(a), and certify that its facilities comply with the extensive good-manufacturing practices' detailed in 21 C.F.R. pts. 210, 211, see FDA Form 356h. The FDA will inspect each facility to “evaluate whether the site is able to reliably perform intended operation(s) at a commercial scale.” Guidance for Industry: ANDA Submissions — Content and Format of Abbreviated New Drug Applications 4 n. 11. The magnitude and costs of the work required before the ANDA is filed soundly link the ANDA filing to the filer’s entry into the market .to compete with the brand-name manufacturer if approval is obtained.
We have emphasized the link in several cases where we have discussed why the litigation authorized by § 271(e)(2) and (5) meets Article Ill’s requirement of a case or controversy. We have pointed to the future real-world market acts as sufficiently connected to the ANDA that triggers the litigation. See Apotex, Inc. v. Daiichi Sankyo, Inc., 781 F.3d 1356, 1365 (Fed.Cir.2015) (‘When a generic manufacturer seeks to enter the market, the concrete stakes are the market sales upon entry.”); Caraco Pharm. Labs., Ltd. v. Forest Labs., Inc., 527 F.3d 1278, 1292 (Fed.Cir.2008) *762 (explaining that “excluding] non-infringing generic drugs from ’the market” is the factual injury that gives rise to a case or controversy). ■ We -have noted that Congress deemed the ANDA filing to. have a non-speculative causal connection to the ANDA filer’s future infliction of real-world market injury ^on the patent holder and that Congress -may “articulate chains of causation that will give rise to a case or controversy where none existed before.” Massachusetts v. EPA, 549 U.S. 497, 516, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007); see Apotex, 781 F.3d at 1365; Sandoz Inc. v. Amgen Inc., 773 F.3d 1274, 1281 (Fed.Cir.2014). (Congress may “effectively creat[e] justiciability that attenuation concerns would otherwise preclude”); Consumer Watchdog v. Wis. Alumni Research Found., 753 F.3d 1258, 1261 (Fed.Cir.2014). The Article III analysis thus confirms the closeness of the connection between Mylan’s ANDA filings and the marketing activities for which Mylan, by those filings, seeks approval.
Those activities will unquestionably take place in Delaware (at least). The subject of the cases before us is whether those activities will infringe' valid patents and should be stopped under the remedial provisions of the Hatch-Waxman Act. Mylan’s ANDA filings, including its certifications regarding the patents at issue here, are thus suit-related, and they have a. substantial connection with Delaware because they reliably, non-speculatively predict Delaware activities by Mylan.
In arguing against this application of due-process standards, Mylan does not meaningfully develop an.argument that a rigid past/future dividing line governs the minimum-contacts standard. Specifically, Mylan does not show that a State is forbidden to exercise its judicial power to prevent a defendant’s planned -future conduct in the State, but must wait until the conduct occurs. Such- a rule would run counter to the legal tradition of injunctive actions to prevent a defendant’s planned, non-speculative harmful conduct before it occurs. See United States v. W.T. Grant Co., 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953) (“The purpose of an injunction is to prevent future violations, ... and, of course, it can be utilized even without a showing of past wrongs.”); 43A C.J.S. Injunctions § 49 (2015); 11A Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, Richard L. Marcus, & Adam N. Steinman, Federal Practice & Procedure § 2948.1 (3d ed.2015). As long as the connection to the planned acts is close enough, the subject of such actions readily fits- the terms of the minimum-contacts standard — conduct purposefully directed at the State that gives rise and is related to the suit. A State’s exercise of jurisdiction over a defendant planning such conduct can hardly come as a surprise to the defendant and does nothing to “offend ‘traditional notions of fair play and substantial justice.’ ’ Int’l Shoe, 326 U.S. at 316, 66 S.Ct. 154 (citation omitted); see also Burger King, 471 U.S. at 479, 105 S.Ct. 2174 (explaining that personal jurisdiction- should realistically consider the object of the dispute and noting that “.contemplated future consequences” can play a role in the inquiry); Roth v. Garcia Marquez, 942 F.2d. 617, 622 (9th Cir.1991) (finding purposeful availment to support specific personal jurisdiction over defendant in a contract dispute because “the contract [at issue] concerned a film, most of the work for which would have been performed in [the forum]”).
. For those reasons, it suffices for Delaware to meet the minimum-contacts requirement in the present cases that My-lan’s ANDA filings and its distribution channels establish that Mylan plans to market its proposed drugs in Delaware and the lawsuit is about patent constraints *763 on such in-State marketing. And we are not barred from adopting that commonsense conclusion by this court’s decision in Zeneca Ltd. v. Mylan Pharmaceuticals, Inc., 173 F.3d 829 (Fed.Cir.1999). That case was decided without any majority opinion, and neither of the two. single-judge opinions (Judge Rich dissented without, opinion) addresses whether the location of the ANDA filer’s future sales could support specific personal jurisdiction over the filer in the § 271(e)(2) suit, so Zeneca is not precedent on that issue. See Automated Merchandising Sys., Inc. v. Lee, 782 F.3d 1376, 1381 (Fed.Cir.2015); Lumbermens Mut. Cas. Co. v. United States, 654 F.3d 1305, 1317 n. 10 (Fed.Cir.2011). The issue was not presented to the court in Zeneca. The parties consistently stated in their briefs that the only contact with the forum at issue was the act of making the ANDA filing (at the FDA’s office in Maryland). Briéf for Defendant-Appellant Mylan Pharmaceuticals, Inc. at 2, Zeneca (No. 97-1477), 1997 WL 33545105; Brief for Plaintiff-Appellee Zeneca Limit-' ed at' 11, Zéneca (No. 97-1477), 1997 WL 33545104. That limit on the issue before this court was reflected in the question certified for interlocutory appeal. See Zeneca, 173 F.3d at 830-31 (Gajarsa, J., concurring in the judgment of reversal). In deciding only that issue, this court in Zeneca simply did not examine whether planned marketing in Maryland would have supported personal jurisdiction there.
Here, to reiterate, Mylan seeks approval to sell its generic drugs throughout the United States, including in Delaware, and it is undisputed that Mylan plans to direct sales of its generic drugs into Delaware. The complaints in these cases allege that Mylan’s generic drugs would'be distributed and sold in Delaware and that Mylan intends to commercially manufacture, use, and sell the generics upon receiving FDA approval. As Mylan admits, it develops drugs for the entire U.S. market and does some business- in every State, either directly or indirectly. Pursuant to DeLCode Ann. tit. 8, §§ 371(b)(2), 376(a), Mylan has registered to do business in Delaware and appointed an agent to accept service of process there. Mylan indicated in its certificate of registration that it intends to engage in “[pjharmaceutieal manufacturing, distribution and sales” in Delaware, Acorda J.A. 79; AstraZeneca J.A. 65, and Mylan registered with the Delaware Board of Pharmacy as a licensed “Pharmacy-Wholesale” and a “Distributor/Manufacturer CSR-” And even if Mylan does not sell its drugs directly into Delaware, it has a network of ■ independent wholesalers and distributors with which it contracts to market the drugs in Delaware. Such directing of sales into Delaware is sufficient for minimum contacts. See Beverly Hills Fan, 21 F.3d at 1565 (finding purposeful contacts where “the accused [infringing device], arrived in Virginia through defendants’ purposeful shipment ... through an established distribution channel”).
One point remains. A finding of minimum contacts does not end the due-process inquiry — let alone any non-constitutional venue inquiries — into whether a case properly remains in a forum. Even if a defendant has minimum suit-related contacts with a State, the defendant may defeat specific personal jurisdiction by sufficiently demonstrating that other considerations render jurisdiction unreasonable. See Burger King, 471 U.S. at 477, 105 S.Ct. 2174. The. Supreme Court has identified a number of factors -to consider, including “the burden on the defendant,” “the forum State’s interest in adjudicating the dispute',” “the plaintiffs interest in obtaining convenient and effective relief,” and “the interstate judicial system’s interest in obtaining the most efficient resolution of controversies.” -World-Wide *764 Volkswagen, 444 U.S. at 292, 100 S.Ct. 559. But Mylan cannot show that those due-process factors weigh against litigating the present cases in Delaware.
The burden on Mylan will be at most modest, as Mylan, a large generic manufacturer, has litigated many ANDA lawsuits in Delaware, including some that it initiated. Delaware has an interest in providing a forum to resolve the disputes before us because they involve the pricing and sale of products in Delaware and harms to firms doing business in Delaware, some of them incorporated or with principal places of business in Delaware. And upholding personal jurisdiction will serve the interests of the plaintiffs and the judicial system in efficient resolution of litigation, because multiple lawsuits against other generic manufacturers on the same patents are pending in Delaware. Indeed, Mylan sent its required notice to Acorda after those actions had already begun. In these cases, there is no substantial argument that considerations of unfairness override the minimum-contacts basis for Delaware’s exercise of specific personal jurisdiction over Mylan.
Conclusion
The decisions of the district court that Mylan is subject to specific personal jurisdiction in the district court for Delaware are affirmed.
AFFIRMED

. Acorda and Alkermes also sued Mylan’s parent corporation, Mylan Inc., but the parties voluntarily dismissed Mylan Inc, without prejudice.