MURDOCK, Justice
(dissenting).
Although I concur in the result reached by the main opinion as to the issue of general jurisdiction, I dissent because I disagree with the main opinion’s conclusion that the trial court lacked specific jurisdiction in this case.
A. General Jurisdiction
I agree with the main opinion’s conclusion that “the trial court correctly concluded that it did not have general jurisdiction *1147 over [General Motors of Canada, Ltd. (‘GM Canada’),]” because “[t]here is simply no evidence in this case indicating that GM Canada had contacts with Alabama that could be considered so continuous and systematic that would render it ‘at home’ in Alabama.” 222 So.3d at 1125. In reaching this conclusion, the main opinion notes the facts that “GM Canada is not incorporated here,” that “its principal place of business is in Canada,” and that “[i]t manufactures, assembles, and sells its product in Canada.” 222 So,3d at 1125. I take this opportunity, however, to emphasize that these facts do not preclude a finding of general jurisdiction where a corporation has “some ... level of intensity of contact” that is “comparable” to incorporating or having a principal place of business in the forum, 222 So.3d at 1122.
In Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 131 S.Ct. 2846, 180 L.Ed.2d 796 (2011), the Supreme Court identified a corporation’s place of incorporation and its principal place of business as “the paradigm forum” for the exercise of general jurisdiction. 564 U.S. at 924. But “paradigm” does not mean “exclusive.” It means a “typical example or archetype.” Memam-Webster’s Collegiate Dictionary 898 (11th ed.2003). Goodyear does not state that general jurisdiction is restricted only to the stated “paradigms.” The Court’s “paradigm” language does not rule out the possibility that a corporation might maintain, for example, two “headquarters,” each bearing ultimate corporate responsibility for different “businesses” so that the corporation is “at home” in either location for a claim arising out of the business “headquartered” in that location. Thus it is that the Court stated in Daimler AG v. Bauman, 571 U.S. -, -, 134 S.Ct. 746, 760, 187 L.Ed.2d 624 (2014), that “Goodyear did not hold that a corporation may be subject to general jurisdiction only in a forum where it is incorporated or has its principal place of business; it simply typed those places paradigm all-purpose forums.”
I also agree that “the inquiry as to general jurisdiction under Goodyear is not whether GM Canada’s contacts with Alabama are in some way ‘continuous and systematic,’ but whether its contacts with Alabama are so ‘continuous and systematic’ that it is essentially ‘at home’ here. 564 U.S. at 919.” 222 So.3d at 1125. I would not agree, however, with the main opinion that “the United States Supreme Court ... recently restricted the scope of general jurisdiction by requiring that the foreign corporation have such contacts with the forum state so as to be ‘at home’ there.” 222 So.3d at 1122 (emphasis added). As is made clear by the authority quoted in Goodyear, the “so continuous and systematic” notion dates back to Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 nn. 8 and 9, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984), and, before that, to the first expression of the test in International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945), whereas the notion of “ ‘continuous activity of some sorts’ ” was rejected equally early:
“International Shoe distinguished from cases that fit within the ‘specific jurisdiction’ categories, ‘instances in which the continuous corporate operations within a state [are] so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities.’ 326 U.S. at 318. Adjudicatory authority so grounded is today called ‘general jurisdiction.’ Helicopteros, 466 U.S. at 414, n. 9 ....
[[Image here]]
“A corporation’s ‘continuous activity of some sorts within a state,’ International *1148 Shoe instructed, ‘is not enough to support the demand that the corporation be amenable to suits unrelated to that .activity.’ 326 U.S. at 318. Our 1952 decision in Perkins v. Benguet Consol. Mining Co.[, 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1962),] remains ([t]he textbook case of general .jurisdiction appropriately exercised over a foreign corporation that has not consented to suit in the forum.’ Donahue v. Far Eastern Air Transport Corp., 652 F.2d 1032, 1037 (C.A.D.C.1981).” .
Goodyear, 564 U.S. at 924-28 (emphasis added).
In short, the test of “continuous arid systematic general business contacts,” properly understood, always has been- and remains the standard. The Court sought with the “at home” metaphor simply to better explain what has always been, and still is, meant by that standard. What the Court was achieving in Goodyear was a rejection of the “continuous activity of some sorts within- a state” test. Goodyear, 564 U.S. at 927. Indeed, after explaining the need for a corporation to be “at honie” in the forum state, the Court concluded its analysis by rearticulating its holding this way: “[The petitioners’], attenuated connections to the State ... fall far short of the ‘the continuous and systematic general business contacts’ necessary,...” 564 U.S. at 929 (emphasis added).
B. Specific Jurisdiction
I respectfully disagree with the main opinion’s conclusion that “the trial court correctly concluded that it did, not have specific jurisdiction over GM- Canada.” 222 So.3d at 1141.
The touchstone of specific in personam jurisdiction since International Shoe Co. has been and continues to be what is “reasonable,” particularly in the sense of what constitutes “fair play” and “substantial justice”:
“The protection against inconvenient litigation is typically described in terms of ‘reasonableness’ or .‘fairness.’ We have said that, the defendant’s, contacts with the forum State must be such that maintenance of the suit ‘does not offend “traditional notions of fair play and substantial justice.” ’ International Shoe Co. v. Washington, [326 U.S. 310], at 316, 66 S.Ct. 154, 90 L.Ed. 95 [ (1945) ], quoting Milliken v. Meyer, 311 U.S. 457, 463[, 61 S.Ct. 339, 85 L.Ed. 278] (1940). The relationship between the defendant and the forum must be such that it is ‘reasonable ... to require the' corporation to defend the particular suit which is brought there.’ 326 U.S. at 317. Implicit in this emphasis on reasonableness is the understanding that the burden on the defendant, while always a primary concern, will in an appropriate case be considered in light of other relevant factors, including the forum State’s interest in adjudicating the dispute, see McGee v. International Life Ins. Co., 355 U.S. 220, 223[, 78 S.Ct. 199, 2 L.Ed.2d 223] (1957); the plaintiffs interest in obtaining convenient and effective relief, see Kulko v. California Superior Court, 436 U.S. [84], at 92[, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978) ], at least when that interest is not adequately protected by the plaintiffs power to choose the forum, cf. Shaffer v. Heitner, 433 U.S. 186, 211, n. 37[, 97 S.Ct. 2569, 53 L.Ed.2d 683] (1977); the interstate judicial system’s interest in obtaining the most effi-dent resolution of controversies; and the shared interest of the several States in furthering fundamental substantive social policies, see Kulko v. California Superior Court, supra, 436 U.S. at 93, 98.” .
World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 292, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980) (emphasis added). To those ends, the World-Wide Volkswagen *1149 Court also explained that the nonresident’s conduct in relation to a state must be such that it “should reasonably anticipate being haled into court there.” Id. at 295. GM Canada, as the trial court found, easily satisfies the “reasonable-anticipation” criteria. See also Ex parte DBI, Inc., 23 So.3d 635, 651 (Ala.2009) (holding that a manufacturer who knowingly manufactured products for distribution throughout the United States market (including Alabama) by a third party meets the “reasonable-anticipation” test as to Alabama).
As noted in the main opinion, GM Canada manufactures and sells hundreds of thousands of vehicles per year to General Motors Corporation, n/k/a Motors Liquidation Company (“MLC”), for the purpose of having those vehicles distributed throughout the United States market, including in Alabama. Despite this fact, the main opinion holds that GM Canada has insufficient contacts with Alabama to subject it to specific jurisdiction in a case arising out of an accident that occurred in Alabama and that involved one of the vehicles sold into the United States market, of which Alabama is a part. The main opinion bases its holding on the fact that GM Canada’s distributor happened to introduce the particular GM Canada vehicle involved in the accident into the United States market by selling it to an automobile dealership in Pennsylvania, rather than to one in Alabama.
The main opinion relies squarely on the Supreme Court decision in Walden v. Fiore, 571 U.S.-, 134 S.Ct. 1115, 188 L.Ed.2d 12 (2014). The main opinion makes much of the fact that Walden was “the United States Supreme Court’s most recent pronouncement on specific jurisdiction and the first case in many years to garner a unanimous Court on the subject,” but it fafis to provide the context for Walden. 222 So.3d at 1140.
Walden was a Bivens action, i.e., a suit based on Bivens v. Six Unknown Federal Narcotics Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), in which “the Supreme Court held that a violation of a person’s Fourth Amendment rights by federal officers, acting under color of federal law, gives rise to a federal cause of action for damages for the unconstitutional conduct.” Michael’A. Rosenhouse, Annotation, Bivens Actions—United States Supreme Court Cases, 22 A.L.R. Fed.2d 159, § 2 (2007). The plaintiffs filed their action in the United States District Court for the District of Nevada against a Covington, Georgia, police officer who was working at the Atlanta Hartsfield-Jackson Airport as a deputized agent of the Drug Enforcement Administration (“DEA”). The DEA agent seized $97,000 from the plaintiffs located in their carry-on luggage during the plaintiffs’ layover at the Atlanta airport on suspicion that the funds were proceeds from illegal drug activity. The plaintiffs protested that they were professional gamblers who lived in Nevada and that the money represented a “gambling ‘ “bank” ’ and winnings.” 571 U.S. at ——-, 134 S.Ct. at 1119. Upon their return home to Las Vegas, the plaintiffs had their attorney contact the DEÁ agent to verify the legitimacy of the funds. The DEA agent nonetheless “helped draft an affidavit to show probable cause for forfeiture of the funds and forwarded that affidavit to a United States Attorney’s Office in Georgia.” Id. No forfeiture action was ever filed, and the funds ultimately were returned to the plaintiffs.
The Walden Court concluded that the Nevada federal district court lacked specific jurisdiction over the Georgia DEA agent because his only connection to Nevada was the fact that the plaintiffs returned to Nevada and therefore suffered a lack of access to the seized funds, while they were in Nevada. The Court found that to allow *1150 the case to go forward in Nevada on such facts would “impermissibly allow[ ] a plaintiffs contacts with the defendant and forum to drive the jurisdictional analysis.” 571 U.S. at-, 134 S.Ct. at 1125. The Court explained that “[t]he proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant’s conduct connects him to the forum in a meaningful way,” and the reality was that the plaintiffs “would have experienced this same lack of access in California, Mississippi, or wherever else they might have traveled and found themselves wanting more money than they had.” Id. In short, the defendant in Walden had no meaningful contacts whatsoever with the forum state, which is the likely reason for the unanimous decision of the United States Supreme Court. See 571 U.S. at-, 134 S.Ct. at 1124 (noting that the DEA agent “never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to Nevada”).
Furthermore, the main opinion relies squarely on a particular, single sentence in Walden: “For a State to exercise jurisdiction consistent with due process, the defendant’s suit-related conduct must create a substantial connection with the forum.” 571 U.S. at-, 134 S.Ct. at 1121. The main opinion asserts that, with this statement, the Walden Court “emphatically underscored the requirement that the claim against the defendant have a suit-related nexus with the forum state before specific jurisdiction can attach.” 222 So.3d at 1140. The main opinion then cites several lower federal court products-liability cases in which, it says, courts exercised specific jurisdiction over a foreign manufacturer when the same automobile that was involved in the accident that precipitated the action was sold in the forum state. The main opinion then states:
“[T]his Court has not found any case in which a trial court has exercised specific jurisdiction over a foreign manufacturer arising from its sale of an allegedly defective vehicle in a foreign jurisdiction to a separate entity in the foreign jurisdiction unless the vehicle was ultimately sold in the forum state.”
222 So.3d at 1141.
In support of its distinction, the main opinion cites Johnson v. Chrysler Canada Inc., 24 F.Supp.3d 1118 (N.D.Ala.2014); Rowland v. General Motors of Canada Ltd., No. 1:11CV183-SA-SAA (N.D.Miss. July 8, 2013) (unpublished opinion); King v. General Motors Corp., No. 5:11-cv-2269-AKK (N.D.Ala. April 18, 2012) (unpublished opinion); Graham v. Hamilton, Civil Action No. 3:11-609 (W.D.La. March 15, 2012) (unpublished opinion); Ray v. Ford Motor Co., No. CIV. A.307-CV-175WH (M.D.Ala. July 11, 2008) (unpublished opinion); and Soria v. Chrysler Canada, Inc., 2011 Ill. App. (2d) 101236, 958 N.E.2d 285, 354 Ill.Dec. 542 (2011).
A review of those cases shows that only in Graham did the court find the fact that the automobile in question was sold in the forum state to be significant in its specific-jurisdiction analysis. (“Here, the products liability claim rests on injuries sustained due to the allegedly defective vehicle manufactured by GM Canada and subsequently sold in Louisiana. Therefore, the Court finds that the cause of action arises out of GM Canada’s forum-related contacts.”) The fact that the subject automobile was sold in Alabama was not mentioned as important to the Johnson court’s conclusion that “Chrysler Canada has constitutionally cognizable contacts with the State of Alabama.” 24 F.Supp.3d at 1141. The same is true of the courts’ analyses in King and Soria (King relied heavily on the analysis irt Soria). The Rowland court did not indicate that the Chevrolet 'Lumina auto *1151 mobile involved in the subject accident was purchased in Mississippi, let alone that such fact was important to the court’s conclusion that GM Canada had sufficient minimum contacts with Mississippi for the court to exercise specific jurisdiction over it. See Rowland (“The facts of the case at bar lean ... in favor of finding minimum contacts” because “GM-Canada sold not thousands, but millions of cars to GM-USA over a ten-year span. And enough of those cars are distributed and sold in Mississippi to support forty-one Chevrolet dealers.... Based upon these facts, it is proper to exercise jurisdiction because it is foreseeable that GM-Canada’s products would be sold in Mississippi.”). The Ray court likewise made no mention of whether the subject Ford vehicle was sold in Alabama. It noted instead that “the evidence shows that Pontiac Coil knew that they were designing a product that would be marketed specifically to Ford, that it would be producing between 600,000 and 1,000,000 solenoids for use in Ford cars over the next three to five years, and knew or should have known that Ford markets its ears in every state in the Union, including Alabama.”
Missing from the main opinion’s litany of cases is Hatton v. Chrysler Canada, Inc., 937 F.Supp.2d 1356 (M.D.Fla.2013). In Hatton, Carolina Hatton alleged that she was seriously injured as a passenger in a 1999 Chrysler 300M automobile that was involved in an accident in Lee County, Florida. In concluding that it had specific • jurisdiction over Chrysler Canada, Inc., the United States District Court for the Middle District of Florida reasoned:
“Accordingly, the ‘stream of commerce’ test remains good law in the Eleventh Circuit, and J. McIntyre [Mach., Ltd. v. Nicastro, 564 U.S. 873, 131 S.Ct. 2780, 180 L.Ed.2d 765 (2011),] does not, as defendant suggests, alter this. Applying the facts of this case to that theory, the Court finds that Chrysler Canada purposely availed itself of the protections of the State of Florida. Chrysler Canada assembled the subject Chrysler 300M for Chrysler United States, which distributes nationally in the United States, and therefore Chrysler Canada invoked the benefits and protections of those states, including Florida. World-Wide Volkswagen Corp., 444 U.S. at 297,100 S.Ct. 559. Therefore, ‘it is not unreasonable to subject [defendant] to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others.’ Id.”
937 F.Supp.2d at 1366. The Hatton court made no mention of whether the subject automobile was sold in Florida, In fact, the court noted that “Count II alleges that Chrysler Canada designed and/or manufactured and assembled the 1999 Chrysler 300M and distributed and sold similar vehicles in Florida.” 937 F.Supp.2d at 1363. Thus, it appears the subject vehicle was not sold in Florida.
Also worth noting is UTC Fire & Security Americas Corp. v. NCS Power, Inc., 844 F.Supp.2d 366 (S.D.N.Y.2012), a case in which UTC Fire & Security Americas Corp., Inc. (“UTC”), a Delaware corporation with its principal place of business in Florida, sued NCS Power, Inc. (“NCS”), in New York federal district court alleging breach of contract and negligence in the design of lithium-ion batteries UTC purchased from NCS. “NCS is a Washington-based corporation that provides batteries and power supply equipment to customers throughout North America.” 844 F.Supp.2d at 369. UTC placed the batteries in “ ‘ActiveKEY,’ a mobile device used by realtors to track listing information about properties and remotely unlock lock boxes.” 844 F.Supp.2d at 369. NCS filed a third-party complaint asserting breaeh-of-contract, products-liability, and negligence claims against Yoku Energy Technology Ltd. (“Yoku”), a corporation headquar *1152 tered in Hong Kong that operates a lithium-ion battery plant in Zhangzhou, China. NCS “servefd] as Yoku’s ‘agent/sales representative’ for distribution of Yoku’s lithium polymer battery products in North America.” 844 F.Supp.2d -at 369. In August 2007, UTC began placing orders with NCS for batteries to be placed in Active-KEY devices. “More than 300,000 Yoku-manufaetured batteries were delivered pursuant to the orders to UTC’s premises in Salem, Oregon.... Upon receiving- the battery shipments, UTC installed them into the ActiveKEY devices and distributed them to realtors, several of which were located in New York.” 844 F.Supp.2d at 369-70. In April and May 2009, Active-KEY batteries began to malfunction and to overheat during use. UTC alleged that it eventually had to replace 36,000 batteries supplied by NCS that had been manufactured by Yoku.
Yoku filed a motion to dismiss for lack of personal jurisdiction. The federal district court noted that Yoku’s agency agreement with NCS required that Yoku' specifically approve all sales, that it shipped vast quantities of batteries for sale to the United States, and that it sold the batteries to a national company. See 844 F.Supp.2d at 376. Given those facts, the court concluded that “the record is sufficient to demonstrate that Yoku has availed itself of the benefits and protections of New York law in a manner that, while insufficient to support general jurisdiction under the New York statute, is sufficient to meet the constitutional minimum contact requirement.” 844 F.Supp.2d at 377 (footnote omitted). Although some of the ActiveKEY devices ended up in New York, the batteries were not purchased by NCS or UTC in- New York and the court did not rely on the number of devices that might have been distributed in New York to reach its conclusion.
More importantly, absent from the main opinion is any discussion of what actually constitutes “suit-relafed conduct” in a products-liability action involving, as it inherently does, issues of markets and “streams of commerce.”[8] In particular, missing from the main opinion’s analysis is any discussion of how properly to understand the concept of “suit-related conduct” in a products-liability suit involving such issues—and in particular how to do so consistently with the abiding touchstones of personal-jurisdiction jurisprudence—the “first principles” of “reasonableness,” “fair play,” and “substantial justice” provided by International Shoe and World-Wide Volkswagen.
I would begin an examination of this substantive question by noting that the Walden Court itself observed that “[t]he inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant ‘focuses on “the relationship among the defendant, the forum, and the litigation.” ’ ” 571 U.S. at -, 134 S.Ct. at 1121 (quoting Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 775, 104 S.Ct. 1473, 79 *1153 L.Ed.2d 790 (1984), quoting in turn Shaffer v. Heitner, 433 U.S. 186, 204, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977)). See also Acorda Therapeutics Inc. v. Mylan Pharm. Inc., 817 F.3d 765, 759 (Fed.Cir.2016) (observing that “[w)hat conduct is suit-related depends on ‘the relationship among the defendant, the forum, and the litigation,’ Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 775, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984), including specifically the nature of the claim asserted. See Calder v. Jones, 465 U.S. 783, 789-90, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984); Walden, [571 U.S. at -,] 134 S.Ct. at 1124 (‘The strength of [the defendant’s] connection [to California in Calder ] was largely a function of the nature of the libel tort.’)” (emphasis added)). In other words, the nature of the plaintiffs claims in a given case must be carefully compared to the nature of the conduct by which the defendant has some relationship with the forum.
In contrast to Walden, which was not a products-liability action and which in no way implicated any questions of the relevant market or the proper stream-of-commerce analysis, the case before us is an Alabama Extended Manufacturer’s Liability Doctrine action arising from an automobile accident. In such actions against a manufacturer that has designed and manufactured a product for distribution throughout the entire United States market, the defendant’s “suit-related conduct” is in fact the design or manufacturing of such automobiles and the placement of them into the stream of commerce for that United States market. GM Canada’s suit-related conduct of manufacturing vehicles for distribution by MLC throughout the United States is the reason GM Canada has a connection to any state, regardless of where MLC happens to place any one particular vehicle. See generally Ex parte DBI.[9]
I do not see how the fact that the particular automobile involved in this case was not sold in Alabama adequately addresses GM Canada’s “suit-related' conduct,” given the reality of modern commerce and markets. And to the extent that the cases GM Canada cites can be said to support making this distinction, I do not understand how those authorities square their conclusions with the analysis in World-Wide Volkswagen Corp. v. Woodson, supra, which, unlike Walden, was a products-liability action concerning an automobile accident.
As to the former point—the commercial realities of the modern marketplace—the principles we would recognize and apply in this case must work equally well in- any number of scenarios. What if on the same Thanksgiving weekend in which Hinrichs was injured in Alabama by a GM Canada vehicle driven here from Pennsylvania, a man had been injured in Pennsylvania by a GM Canada vehicle driven from Alabama? If the same company markets that GM Canada vehicle nationwide, I cannot imagine that it would be “reasonable” to require the Alabama plaintiff to travel to Pennsylvania to litigate his grievance while simultaneously requiring the Pennsylvania plaintiff to travel to Alabama to litigate his, when the defendant in both cases is located in neither state and would have to travel to both of them anyway. “[T]he forum state’s interest in adjudicating the dispute,” “the plaintiffs interest, in.obtaining convenient and effective relief,” and “the interstate judicial system’s interest in *1154 obtaining the most efficient resolution of controversies” all counsel in favor of finding specific jurisdiction in both scenarios.
Similarly, what if a company, although headquartered in New York, markets and sells substantial numbers of its product from multiple retail locations throughout New York, New Jersey, and Connecticut? If that tri-state area is the company’s chosen market, why should it matter whether a New Jersey man injured in New Jersey by one of the defendant’s products purchased that product from one of the defendant’s stores in New Jersey or from one of the defendant’s stores in New York? A fortiori, why should it matter to a bystander injured in New Jersey by one of the defendant’s products whether its owner had purchased that particular product from one of the defendant’s stores in New Jersey or one of the defendant’s New York stores?
But one need not resort to hypotheticals to make the point. There is enough similarity in the facts of World-Wide Volkswagen and this case—the central fact in both being that an automobile sold in one state caused injury in another—that the United States Supreme Court’s emphasis in World-Wide Volkswagen of facts that are dissimilar to those of the present case is strongly indicative of the type of contacts that would support specific jurisdiction in just such a case:
“Applying these principles [of reasonableness, fair play, and substantial justice] to the case at hand, we find in the record before us a total absence of those affiliating circumstances that are a necessary predicate to any exercise of state-court jurisdiction. Petitioners carry on no activity whatsoever in Oklahoma. They close no sales and perform no services there. They avail -themselves of none of the privileges and benefits of Oklahoma law. They solicit no business there either through salespersons or through advertising reasonably calculated to reach the State. Nor does the record show that they regularly sell cars at wholesale or retail to Oklahoma customers or residents or that they indirectly, through others, serve or seek to serve the Oklahoma market. In short, respondents seek to base jurisdiction on one, isolated occurrence and whatever inferences can be drawn therefrom: the fortuitous circumstance that a single Audi automobile, sold in New York to New York residents, happened to suffer an accident while passing through Oklahoma.”
World-Wide Volkswagen, 444 U.S. at 295 (emphasis added; footnote omitted).
In addition to the obvious negative inferences to be drawn from this passage, in Goodyear the Court specifically quoted with approval the following more affirmative statement from World-Wide Volkswagen:
“[WJhere ‘the sale of a product ... is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve ... the market for its product in [several] States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others’ (emphasis added)).”[10]
*1155 Goodyear, 564 U.S. 915 (quoting WorldWide Volkswagen, 444 U.S. at 297 (some emphasis added)).
In fact, the negative inferences from World-Wide Volkswagen and the affirmative statement of the same concept in Goodyear actually have been reflected for some time in a comment in the Restatement of Conflicts:
“The fact that the effect in the state was only foreseeable will not of itself suffice to give the state judicial jurisdiction over the defendant. Judicial jurisdiction is likely to exist in such a case, however, if it was somewhat more than merely foreseeable that the defendant’s act would cause the particular effect in the state.... Jurisdiction will also exist where, in addition to the effect being foreseeable, the defendant has other relationships with the state. So when a seller of automobiles in state X sells an automobile which is involved in an accident in state Y, state Y will not have judicial jurisdiction over the seller on the mere ground that it was foreseeable that the automobile would be driven to state Y and would there be involved in an accident. Judicial jurisdiction would exist, however, if, for example, the seller maintained a sales agency in state Y or shipped automobiles into state Y for resale by an independent agency.”
Restatement (Second) Conflict of Laws § 37 comment e (rev. ed.1988) (emphasis added).
The implication of World-Wide Volkswagen is that if the New York dealer and distributor had been actively marketing their products to Oklahoma customers, the mere fortuity that the injury-causing vehicle was purchased in New York would not have defeated jurisdiction in Oklahoma. GM Canada in this case seeks to enjoy the benefits of the sale of its vehicles in the whole of the United States market while at the same time avoiding “reasonable” obligations concomitant to such sales.
It is true that “the mere ‘unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State.’” World-Wide Volkswagen, 444 U.S. at 298 (quoting Hanson v. Denckla, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)). That is the circumstance the Court analyzed in World-Wide Volkswagen, but is not at all what is presented here. Unlike the dealer and distributor in World-Wide Volkswagen, who had no “ ‘contacts, ties, or relations’ ” with the forum state, 444 U.S. at 299 (quoting International Shoe, 326 U.S. at 319), GM Canada is not deprived of fair play and substantial justice by being required to answer in Alabama for an accident that took place here involving one of the vehicles it chose to manufacture for sale into the nationwide market that includes this state. GM Canada certainly can “reasonably anticipate” being held to account in Alabama for injuries caused in this state by one of the vehicles it has designed and manufactured for a United States market that includes this state arid, consequently, can take steps to withdraw any sale of its products in this state, to procure insurance applicable to any incidents occurring here or otherwise to “act to alleviate the risk of *1156 burdensome litigation.” World-Wide Volkswagen, 444 U.S. at 297.
It is “reasonable,” “fair,” and “substantially just” to conclude that the trial court has specific jurisdiction over GM Canada in this case.
WISE, J,, concurs.

. Instead of issues of markets and analysis of streams of commerce, Walden turned on the so-called “effects” test first enunciated in Calder v. Jones, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984), which essentially held that "defendants engaging in intentional tor-tious conduct out-of-state, calculated to cause injury to a plaintiff in-state, were subject to jurisdiction in the state in which the effects of their intentional conduct were felt.” Lee Goldman, From Calder to Walden and Beyond: The Proper Application of the “Effects Test” in Personal Jurisdiction Cases, 52 San Diego L.Rev. 357, 358 (2015). See John T. Parry, Rethinking Personal Jurisdiction After Bauman and Walden, 19 Lewis & Clark L.Rev. 607, 609 (2015) (noting that "Justice Thomas’s opinion for a unanimous Court in Walden clarifies the doctrinal landscape, but its focus on intentional torts and the scope of the Calder v. Jones ‘effects’ test complicates the effort to determine whether it has broader significance”).

. DBI involved an automobile seat belt that failed in Alabama causing injury here. Although the seat belt that failed in DBI had been installed in an automobile "distributed” by a third party to Alabama for retail sale here, the defendant in DBI asserted no more control over the place of entry into the United States market of the particular seat belt at issue there than did GM Canada of the automobile at issue in this case.

. Similarly, in another United States Supreme Court case released the same day as Goodyear, Justice Ginsburg observed:
"Notably, the foreign manufacturer of the Audi in World-Wide Volkswagen did not object to the jurisdiction of the Oklahoma courts and the U.S. importer abandoned its initially stated objection. 444 U.S. at 288, and n. 3. And most relevant here, the Court’s opinion indicates that an objection to jurisdiction by the manufacturer or national distributor would have been unavail *1155 ing. To reiterate, the Court said in WorldWide Volkswagen that, when a manufacturer or distributor aims to sell its product to customers in several States, it is reasonable ‘to subject it to suit in [any] one of those States if its allegedly defective [product] has there been the source of injury.’ Id., at 297.”
J. McIntyre Mach., Ltd. v. Nicastro, 564 U.S. 873, 907, 131 S.Ct. 2780, 180 L.Ed.2d 765 (2011) (Ginsburg, J., dissenting).